UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-23229-Civ-GOLD
        (06-20513-Cr-GOLD)
MAGISTRATE JUDGE P. A. WHITE

ALAN GLAUBMAN,                    :

            Movant,              :

v.                               :      **REPORT OF MAGISTRATE JUDGE**
                                        **FOLLOWING EVIDENTIARY HEARING**

UNITED STATES OF AMERICA  :

            Respondent.         :
_____

Introduction

    This matter is before this Court on the movant's motion to vacate pursuant to 28 U.S.C. §2255, attacking his conviction and sentence for conspiracy to commit mail fraud entered following a guilty plea in case no. 06-20513-Cr-Gold.

    The Court has reviewed the motion with supporting memoranda and exhibits (Cv-DE#s1,26-27), the government's responses with multiple exhibits (Cv-DE#10,29), the movant's replies (Cv-DE#11,30), the Presentence Investigation Report (PSI), and all pertinent portions of the underlying criminal file.

    Construing the movant's claims liberally as afforded *pro se* litigants pursuant to Haines v. Kerner, 404 U.S. 419 (1972), the appears to raise the following claims:

            1.   He was denied effective assistance of
                 counsel, where his lawyer failed to file
                 a   requested   direct   appeal   after
                 imposition  of  sentence,  and  again  for
                 failing  to  appeal  a  subsequent  amended

restitution order. (Cv-DE#1:Memo:1,2,12).

2.   He was denied effective assistance of counsel, where his lawyer failed to argue that the government breached the terms of an use immunity agreement. (Cv-DE#1:Memo:4).

3.   He was denied effective assistance of counsel, where his lawyer failed to ensure that his client was mentally competent to enter into a negotiated plea and attend both the Rule 11 and sentencing proceedings. (Cv-DE#1:Memo:4).

4.   He was denied effective assistance of counsel, where his lawyer failed to object to the court's determination that home confinement in lieu of prison was not available as a sentencing option. (Cv-DE#1:Memo:4).

5.   He was denied effective assistance of counsel, where his lawyer failed to seek a downward departure in sentence pursuant to U.S.S.G. §5K2.13 based on the movant's diminished mental capacity. (Cv-DE#1:Memo:10).

6.   He was denied effective assistance of counsel, where his lawyer failed to file a pretrial motion to suppress prior to the movant's change of plea proceedings. (Cv-DE#1:Memo:11).

7.   The movant was unaware of the consequences of his plea because he was suffering from a mental condition which resulted in his guilty plea being unintelligent, unknowing, and involuntary.[1]

---

[1]At the evidentiary hearing, the movant appeared to raise the argument that the plea was not knowing and voluntary because the movant was suffering from a mental disease or defect at the time of its entry. After the hearing concluded, the parties briefed whether this argument related back to the timely filed claims or whether it raised a new, time-barred claim. After careful review of the

After review of the record, it became apparent that an evidentiary hearing was necessary at least with regard to claim one, as listed above. Martin Feigenbaum, Esquire was appointed to represent the movant, and an evidentiary hearing held on September 11, 2008.

Factual and Procedural History

For an appreciation of this case and the claims raised herein, a detailed factual and procedural history of the underlying criminal case is required.

On September 30, 2004, United States Postal Inspectors executed a search warrant at the business offices of Pantheon Holdings, Inc. ("Pantheon"), as well as, M & G Media and Marketing

---

record, however, it is not entirely clear whether this claim relates back to the movant's timely filed motion as it merely provides facts in support of the previously timely-filed claim or is time-barred as it raises a new substantive claim. See Davenport v. United States, 217 F.3d 1341 (11th Cir. 2000). In Davenport, supra, the Eleventh Circuit held that a claim which was not part of the original timely filed motion to vacate does not relate back to the original claims if the latter claim does not arise out of the same conduct, transaction, or occurrence. Davenport, supra, citing, United States v. Craycraft, 167 F.3d 451, 456-7 (8 Cir. 1999)(out-of-time claim of ineffective assistance of counsel for not filing an appeal did not relate back to timely claims of ineffective assistance of counsel raised in the initial timely-filed §2255 motion); see also, Pruitt v. United States, 274 F.3d 1315, 1318 (11 Cir. 2001).

The law is clear that in order for an untimely claim to be considered, it must arise from the same facts as the timely filed claim, not from separate conduct or occurrence. See Dean v. United States, 278 F.3d 1218, 1222 (11th Cir. 2002); Fed.R.Cr.P. 15(c). The untimely claims must have more in common with the timely filed claim than the mere fact that they arose out of the same trial and sentencing proceedings. See Pruitt v. United States, 274 F.3d at 1319, citing, United States v. Pittman, 209 F.3d 314 (4th Cir. 2000); United States v. Duffus, 174 F.3d 333 (3rd Cir.), cert. den'd, 528 U.S. 866 (1999); United States v. Craycraft, 167 F.3d 451 (8th Cir. 1999). The issue of the timeliness of this claim, however, need not be decided, as the movant is entitled to no relief thereon.

Workforce Provider.[2] (Cv-DE#10:Ex.1). During that search, inspectors discovered numerous business documents, including sales scripts, sales commission logs, deal logs, customer contact lists, purchase orders, and promotional material relating to Pantheon's business dealings. (Id.). Inspectors also seized computers containing information from hundreds of consumers, including the contact name, the quantity of machines purchased, amounts paid by them to Pantheon, and other sales information. (Id.).

Evidence obtained at that time established that Pantheon was, in fact, a fraudulent business opportunity firm. (Id.). The stipulated factual proffer (Cv-DE#1:Ex.I) reveals that in February 2004, the movant began working for Pantheon, which purported to sell internet kiosks, including assistance in establishing, maintaining, and operating an internet kiosk business. (Id.).

Pantheon placed advertisements on television, the internet, and other media across the country, indicating that huge profits could purportedly be earned by purchasing a Pantheon distributorship. Consumers responding to the ads were placed in contact with salesmen known as "fronters" who explained that the kiosk, placed in a location in the consumer's geographical area, would provide internet service for a fee to the public, and the Pantheon purchaser would collect a commission based on kiosk use.

After the fronters' sales pitch finished, the potential purchasers were then transferred to another salesperson, known as a "closer," who represented themselves to prospective purchasers as Territory Directors, responsible for setting up distributors in the purchaser's geographical area. In reality, however, the closers

---

[2]On the same date the search warrant was executed at Pantheon, Postal Inspectors delivered to the movant a letter notifying him that he was a target of the Pantheon investigation. (Cv-DE#10:Ex.1).

took calls from anywhere in the United States. The potential purchasers were then sent a glossy brochure and a DVD or video containing a "money report," which is an infomercial promoting the huge earnings that could be made from Pantheon.

Regarding the movant's involvement, it was stipulated that the movant was hired as President of Pantheon by the firm's undisclosed principals. The principals named the movant President because they wanted a person with a clean record to serve as the front for the business. This was important because it enabled potential purchasers to believe they were purchasing a legitimate business. The principals, however, dictated Pantheon's direction. As President, the movant performed various administrative functions that aided and abetted the scheme to defraud, including executing purchase orders, signing documents as the firm's president, and generally holding himself out as a person with actual authority, in order to conceal the firm's true principals.

Pantheon's sales people made numerous material false statements, and concealed or otherwise omitted relevant information. In fact, purchasers were not advised that Pantheon had difficulty finding profitable locations to place the kiosks, that unprofitable kiosks were not being relocated because they couldn't even find viable ones for new purchasers, and that investors didn't actually see a return on their investments, despite promises to the contrary. The stipulated facts further established that the movant's role in the offense resulted in over 250 victims, with a total of consumer losses ranging between $7 to $20 million dollars.

In October 2004, the movant retained Don S. Cohn, Esquire, to represent him in the criminal proceedings arising from the Pantheon investigation. (Cv-DE#10:Ex.2). After further investigation by Postal Inspectors and discussions with movant's counsel's, the government and the movant entered into an informal, limited

5

immunity agreement/proffer letter on March 4, 2005. (Cv-DE#10:Ex.3). The agreementpermitted the government derivative use of the movant's statements, including its introduction against the movant at any proceeding. (Id.:2). As part of the agreement, the movant waived the necessity for a Kastigar[3] hearing, thereby eliminating the government's need to prove the evidence it would introduce at trial was not tainted by any statements made by the movant during his debriefing.(Id.). Moreover, the movant also acknowledged that the agreement did not impart any "transactional immunity," and therefore, the government reserved the right to charge the movant with any federal crime committed by him, regardless of whether the evidence to support the charges came before or after the movant's debriefing. (Id.).

On March 7, 2005, three days after the movant executed the agreement with the government, the movant was debriefed by the government. (Cv-DE#10:Ex.1). Several months later, in December 2005, the parties signed a negotiated plea agreement, wherein the movant agreed to waive Indictment and plead guilty to a one count Information charging him with conspiracy to commit mail fraud, in violation of 18 U.S.C. §1349. (Cv-DE#1:Ex.I). The movant acknowledged that his sentence would be imposed after the court considered the federal sentencing guidelines, and that the applicable advisory guidelines would be determined by the Court relying in part on the results of a PSI. (    Id.:2). The movant further acknowledged that the court could depart from the advisory guideline range and impose a sentence that is either more or less severe, and is permitted to tailor the ultimate sentence in light

---

[3]The Supreme Court held that while prosecution of a defendant who has previously given self-incriminating testimony pursuant to a grant of immunity is allowable, the government is prohibited from "using the compelled testimony in any respect" that would "lead to the infliction of criminal penalties on the witness." United States v. Kastigar, 406 U.S. at 441, 453 (1972).

of other statutory concerns. (<u>Id</u>.). The movant understood that the
court had the authority to impose a sentence up to the statutory
maximum, to-wit, 20 years in prison, for the offense and that the
movant could not withdraw his plea solely as a result of the
sentence imposed. (<u>Id</u>.). In exchange, the government agreed to
recommend up to a three level reduction in the movant's base
offense level based on his timely acceptance of responsibility.
(<u>Id</u>.).

     The movant and the government both agreed to recommend,
although not binding on the probation officer or the court, that
the court impose a sentence within the advisory guideline range,
and that it neither depart upward nor downward at the time of
sentencing. (<u>Id</u>.). The parties further agreed to recommend as
follows: a) that the 2004 federal guidelines would apply; b) that
the initial base offense level is 7 pursuant to U.S.S.G.
§2B1.1(a)(1); c) that the amount of actual, probable, or intended
loss under U.S.S.G. §2B1.1(b)(1) is more than $7,000,000.00 but
less than $20,000,000.00; d) that there were more than 250 victims;
e) that the movant should receive a two level increase in his base
offense level pursuant to U.S.S.G. §3B1.2(b), based on his role in
the offense; and f) that the total adjusted guideline base offense
level, before the three level reduction for acceptance of
responsibility, would be a level 31. (<u>Id</u>.:6-7).

     The movant further agreed to waive his right to appeal any
sentence imposed, including any restitution order, or to appeal the
manner in which the sentence was imposed, unless the sentence
exceeded the maximum permitted by statute or was the result of an
upward departure from the guideline range the court established at
sentencing. (<u>Id</u>.:7). More importantly, the movant also agreed to
waive collateral, post-conviction attack of the conviction or
sentence imposed. (<u>Id</u>.).

7

On August 22, 2006, the government filed an Information charging the movant with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. §1349. (Cr-DE#1). Specifically, the Information alleged that the movant conspired to defraud consumers in connection with Pantheon. (Id.:2-3.)

On October 6, 2006, the movant pled guilty to the single count of the Information pursuant to a written plea agreement with the government. (Cr-DE#s13,14.) At the plea colloquy, the Court questioned the movant regarding the plea agreement, his competency to enter a plea, and the representation by his attorney. At the commencement of the hearing, after being sworn, the movant testified under oath that he was forty-eight years old and had completed twelfth grade. (Cv-DE#1:Ex.D-Transcript of Plea Colloquy:4). The movant, however, denied being treated for any mental illness in the last year. (Id.:3-4). He stated that, although he had taken an unspecified drug or medication in the last 24 hours, it had not affected his ability to understand or comprehend what was happening around him, and that he understood everything that the judge asked of him. (Id.:5). He reaffirmed that he had no mental or physical condition or illness that would prevent him from understanding what was happening in court. (Id.).

During the change of plea hearing, the movant affirmatively acknowledged that he: 1) had received a copy of the Information and had waived indictment in this case; 2) had fully discussed the charges and the case in general with Attorney Cohn; 3) had discussed the government's evidence with his attorney; 4) was fully satisfied with Attorney Cohn's representation, and the advice that he received from counsel; 5) had a duplicate of his original plea agreement in front of him; 6) read the plea agreement before he signed it; and 7) had reviewed the factual basis for the plea with his attorney, which was true and correct. (Id.:3-16). As part of a colloquy, the movant acknowledged his understanding of portions of

8

the plea agreement described by the court. (Id.9-12). The court specifically reviewed the penalties associated with the crime, including imprisonment, and the application of the advisory federal sentencing guidelines. (Id.:8-9). The movant also agreed that he was waiving the right to collaterally attack the conviction and sentence imposed, which would preclude him from later arguing in pertinent part that his "attorney was ineffective here at the plea colloquy or at your sentencing." (Id.:11). The movant confirmed that understood all of these provisions as detailed in the plea agreement. (Id.).

The movant also denied being forced or coerced into changing his plea, and was doing so of his own volition. (Id.). Thereafter, the court advised, and the movant acknowledged, all of the constitutional rights he was waiving, as well as, the underlying factual basis for his plea. (Id.:12-15). The court then accepted the movant's plea, finding that the movant was fully competent and capable of entering an informed plea. (Id.:15.). Specifically, the court noted the movant had "entered the plea and agreement with advice and assistance of effective and competent counsel and that he has knowingly and voluntarily waived his right to appeal and to collaterally attack the sentence imposed." (Id.:15-16.). Having made that determination, the court accepted the movant's guilty plea. (Id.:16.).

Prior to sentencing, a PSI was then prepared which reveals as follows. Part C of the PSI contained a description of offender characteristics, wherein the movant's mental and emotional states were discussed in detail. (PSI ¶¶70-71). Also included in the PSI were statements from the movant's psychiatrist, Dr. Shlomo Pascal, discussing the movant's ongoing treatment for depression and anxiety. (Id.).

The PSI further established an initial base offense level 7,

pursuant to U.S.S.G. §2B.1, the guideline for violation of 18 U.S.C. §1349. (PSI ¶40). An additional 20 levels were added, pursuant to U.S.S.G. §2B1.1(b)(1)(K), because the loss involved more than $7 million, but less than $20 million dollars. (PSI ¶41). Pursuant to U.S.S.G. §2B1.1(b)(2)(C), 6 more levels were added because the offense involved 250 or more victims. (PSI ¶42). Two levels were them deducted based on the movant's minor role in the offense. (PSI ¶44). An additional 3 levels were deducted based on the movant's timely acceptance of responsibility, resulting in a total adjusted base offense level 28. (PSI ¶¶48-50). The probation officer next determined that the movant had a total of zero criminal history points, resulting in a criminal history category I. (PSI ¶53).

The probation officer noted that the statutory term of imprisonment for violation of 18 U.S.C. §1341 was zero to 20 years in prison. (PSI ¶92). However, based on a total offense level 28 and a corresponding criminal history category I, the guideline range was 78 to 97 months in prison. (PSI ¶93).

On December 20, 2006, the movant appeared for sentencing. (Cv-DE#1:Ex.G-12/20/06 Sentencing Transcript). At that time, the court acknowledged that it had received letters written on the movant's behalf. (Id.:4). Attorney Cohn then addressed the court, advising the court that he had reviewed the PSI with the movant, and that there were only two factual objections which had no impact on the advisory guidelines. (Id.:3). The Court ascertained that the parties were in agreement as to: (1) the offense level pursuant to the advisory guidelines and criminal history category; and (2) the sentence imposed should be at the low end of the advisory guideline range. (Id.:5-6).

The movant was then afforded the opportunity to allocute prior to imposition of sentence. (Id.). At that time, the movant

apologized for hurting the victims, reminded the court that he had never violated the law before this incident, and then asked the court to consider imposing a probationary sentence. (Id.). The court responded, commenting as follows:

> You have to listen carefully. Probation is not an option. Home detention is not an option.
>
> You're going to prison, sir. This is a serious crime. You entered a plea agreement that you signed that agreed to a sentence at the low end of the advisory guidelines. I'm honoring that plea agreement.
>
> I could go substantially higher here if I looked into this issue without the benefit of the plea agreement, so I just want you to know outright that this is not something that you're going to be able to walk away from.

(Id.).

After hearing testimony from several acquaintances who spoke on the movant's behalf, and prior to imposing sentence, the court found as follows:

> ...I'd like to point out that this PSR, presentence report, goes into considerable detail about the circumstances of this matter and its seriousness, also goes into related cases.
>
> There are more than 250 victims involved in this matter and a loss of over $18 million. This is not an insignificant issue.
>
> It is not a question of just compassion; it's a question of reaching a just punishment in this matter, taking into account the offense conduct and the harm that has been done.
>
> So, I've considered the statements of the parties, the presentence report which contains the advisory guidelines and the statutory factors, particularly the seriousness of this offense and the need to provide a punishment that is significant in relationship to it.
>
> I find that a sentence at the low end of the advisory guidelines is a reasonable sentence.

(Id.10-11).

11

The court then sentenced the movant to the low end of the advisory guideline range, to a total term of 78 months in prison, followed by 3 years of supervised release, and further ordered restitution in the amount of $18,135,958.70. (Cr-DE#20). The judgment was entered by the Clerk on December 28, 2006. (Cr-DE#20). No direct appeal was filed. The judgment of conviction in the underlying criminal case became final at the latest on January 11, 2007, ten days after the entry of judgment, when time expired for filing a notice of appeal.[4]

On February 1, 2007, the U.S. Probation Officer wrote a memorandum to the court requesting an order to amend the restitution amount in the Judgment to reflect additional loss amounts of two previously identified victims. (Cr-DE#22). After several attorneys withdrew from the case, Attorney Allen S. Kaufman was assigned to represent Glaubman. (Cr-DE#30). The Court held a hearing on the matter on April 12, 2007. (Cr-DE#33). On April 26, 2007, the Court filed an Order Amending Restitution Amount to include an additional $18,980 owing to the two previously named victims. (Cr-DE#35). No direct appeal from this Order was filed.

At the latest, the movant was required to file this motion to vacate within one year from the time the judgment became final, or no later than January 11, 2008. See Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986). This motion to vacate was timely filed by the movant on December 5, 2007, when he signed and turned it over to

---

[4]Where, as here, a defendant does not pursue a direct appeal, the conviction becomes final when the time for filing a direct appeal expires. Adams v. United States, 173 F.3d 1339, 1342 n.2 (11th Cir. 1999). The time for filing a direct appeal expires ten days after the judgment or order being appealed is entered. Fed.R.App.P. 4(b)(1)(A)(I). The judgment is "entered" when it is entered on the docket by the Clerk of Court. Fed.R.App.P. 4(b)(6). On December 1, 2002, Fed.R.App.P. 26 which contains the rules on computing and extending time, was amended so that intermediate weekends and holidays are excluded from the time computation for all pleadings due in less than 11 days.

prison officials for mailing.[5] (Cv-DE#1).

<u>Waiver of Right to Collaterally Attack Conviction/Sentence</u>

Before the court can address any of the issues that the movant raises in this §2255 proceeding, it must consider the validity of movant's waiver of his right to appeal and collaterally attack his conviction and sentence as contained in his plea agreement. As previously narrated in this Report, the specific terms of the plea agreement provided that the movant was waiving his right to appeal the sentence imposed, and more importantly, also expressly waived any and all rights to a collateral, post-conviction attack of the conviction and sentence imposed.

The law is clear that for a defendant's waiver of his appellate rights to be effective, the waiver must have been knowingly and voluntarily entered. <u>United States v. Bushert</u>, 997 F.2d 1343, 1345 (11th Cir. 1993); <u>see also</u>, <u>United States v. Benitez-Zapata</u>, 131 F.3d 1444, 1445 (11th Cir. 1997). The government must demonstrate "that either (1) the district court specifically questioned the defendant concerning the sentence appeal waiver during the Rule 11 colloquy, or (2) it is manifestly clear from the record that the defendant otherwise understood the full significance of the waiver." <u>Bushert</u>, 997 F.2d at 1351.

As discussed in detail previously in this Report, the movant acknowledged under oath to the Court that he understood he was waiving his right to collaterally attack post-conviction his conviction and sentence, which included the right to challenge

---

[5]<u>See</u>: <u>Adams v. U.S.</u>, 173 F.3d 1339 (11 Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

counsel's effectiveness during those proceedings. In fact, after independent review of the record, it is clear that the movant was satisfied with counsel's representation, and was freely changing his plea to guilty, without being coerced or otherwise forced to do so.

Under these circumstances, the court finds that the movant's waiver of his post-conviction collateral attack rights was knowing and voluntary, as required by Bushert. The waiver was clearly set forth in his plea agreement, which the movant stated under oath that he read, discussed with his attorney, and understood. He signed the plea agreement, indicating his acceptance and understanding of the waiver provision, under penalty of perjury. In addition, at his Rule 11 hearing, the court raised the waiver provision, discussed it with movant, and ensured that movant had read and understood it and agreed to it without the undue influence of his attorney or any other party. The court also explained to the movant the consequences of such a waiver, and movant still indicated that he had freely and knowingly entered into the agreement.

Because the movant knowingly and voluntarily waived his right to collaterally attack his conviction and sentence, that waiver must be enforced. See Benitez-Zapata, 131 F.3d at 1447 (dismissing defendant's appeal after upholding waiver of appellate rights in plea agreement).

Notwithstanding the analysis above, the movant's claims of ineffective assistance of counsel may not be precluded by the appeal waiver, as "there may be a distinction between a §2255 claim of ineffective assistance in entering or negotiating the plea versus a claim of ineffectiveness at sentencing or a claim

14

challenging the validity of the plea or agreement." <u>Williams v.</u>
<u>United States</u>, 396 F.3d 1340, 1342 (11th Cir. 2005); <u>see also</u> <u>Vaca-</u>
<u>Ortiz v. United States</u>, 320 F . Supp.2d at 1362, 1365 (N.D.Ga.
2004)("[T]he court notes that a criminal defendant could not waive
the right to bring a claim for ineffective assistance of counsel in
which he alleges ineffectiveness at the time he was entering the
plea or ineffectiveness related to advice he received regarding the
waiver.").

Regardless, ineffective assistance of counsel claims are
subject to the two-part test enunciated in <u>Strickland v.</u>
<u>Washington</u>, 466 U.S. 668 (1994), which is not a favorable standard
to the movant. <u>See</u> <u>Massaro v. United States</u>, 538 U.S. 500, 505
(2003). First, the movant must show that "counsel's representation
fell below an objective standard of reasonableness." <u>Strickland</u>,
466 U.S. at 688. In applying this test, reviewing courts "must
indulge a strong presumption that counsel's conduct falls within
the wide range of reasonably professional assistance[.]"
<u>Strickland</u>, 466 U.S. at 689; <u>see also</u> <u>Lancaster v. Newsome</u>, 880
F.2d 362, 375 (11th Cir. 1989) (emphasizing "that petitioner was not
entitled to error-free representation"). "A petitioner must
overcome a strong presumption of competence, and the court must
give significant deference to the attorney's decisions." <u>Hagins v.</u>
<u>United States</u>, 267 F.3d 1202, 1204-05 (11th Cir. 2001). Second, the
movant must establish prejudice by showing "that counsel's errors
were so serious as to deprive the defendant of a fair trial, a
trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687. In
the context of a guilty plea, the court must normally inquire as to
whether counsel's performance affected the outcome of the plea
process. <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

In applying the <u>Strickland</u> components outlined above, "[a]

15

court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies .... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Smith v. Wainwright, 777 F.2d 609, 616 (11th Cir. 1985). Under the prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome ...." Id. at 616 (citing Strickland, 466 U.S. at 694-95). The Eleventh Circuit has aptly stated that an affirmative showing of prejudice that would undermine the results of the proceedings is necessary because "'attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some conceivable effect on the outcome of the proceeding' is insufficient to show prejudice." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations omitted).

"Given the strong presumption in favor of competence, the petitioner's burden of persuasion-though the presumption is not insurmountable-is a heavy one." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). As the Eleventh Circuit has succinctly stated, "[T]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995)(en banc). "[C]ases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Id. at 1511.

<u>Evidentiary Hearing Claim</u>

In **claim one,** the movant asserts that his lawyer failed to file a requested direct appeal. (Cv-DE#1:Memo:2; Cv-DE#11:4). According to the movant, immediately after imposition of sentence on December 20, 2006, while he was still in the courtroom, he directed counsel to file a notice of appeal. (<u>Id</u>.). The claim was not conclusively refuted by the record, and warranted further evidentiary findings. At the September 11, 2008 evidentiary hearing, testimony was taken from the movant, and his criminal defense attorneys, Don Cohn, Esquire and Allen Kaufman, Esquire.

It is clear that a counsel's failure to file a direct appeal after being <u>requested</u> to do so by his client results in a <u>per se</u> constitutional violation of the movant's Sixth Amendment right to counsel, which entitles the movant to an appellate proceeding. <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 477 (2000) ("we have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable").

There is a presumption of prejudice "with no further showing from the defendant of the merits of his underlying claims when the violation of the right to counsel rendered the proceeding presumptively unreliable or entirely nonexistent." <u>Roe v. Flores-Ortega</u>, <u>supra</u> at 484. A defendant need not establish that his direct appeal would have been arguably meritorious; he need only show that his counsel's constitutionally deficient performance deprived him of an appeal he would have otherwise taken--i.e., the defendant expressed to his attorney a desire to appeal. <u>Id</u>.; <u>see also</u>, <u>McElroy v. United States</u>, 2007 WL 4393955, *1 (11th Cir. 2007); <u>Gomez-Diaz v. United States</u>, 433 F.3d 788, 792 (11th Cir.

2005).

Even if a defendant contractually waived the right to appeal, counsel may be ineffective for not filing a notice of appeal when directed to by the client because the merits of an appeal are not to be considered when determining whether an out-of-time appeal should be permitted. Gaston v. United States, 237 Fed.Appx. 495, 497 (11th Cir. 2007). The defendant need not show that there were viable grounds for such an appeal. Martin v. United States, 81 F.3d 1083 (11 Cir. 1996); Montemoino v. United States, 68 F.3d 416, 417 (11 Cir. 1995); Restrepo v. Kelly, 178 F.3d 634, 641-42 (2d Cir. 1999)(holding that a habeas petitioner alleging ineffective assistance of counsel based on counsel's failure to file a requested notice of appeal need not demonstrate that his defaulted appeal would have succeeded in order to establish prejudice sufficient for habeas relief). Prejudice is presumed when counsel fails to file a notice of appeal when requested to do so by a client. Gaston v. United States, 237 Fed.Appx. at 496, citing, Flores-Ortega, 528 U.S. at 483.

In the case of an appeal following a guilty plea, however, the defendant is entitled to an out-of-time appeal of sentencing issues only. Flores-Ortega, 528 U.S. at 483. Only sentencing claims may be raised on an out-of-time appeal following a plea because "the few grounds upon which the guilty plea may be challenged are not limited to direct appellate review, but instead are more appropriately raised in §2255 proceedings." Montemoino at 417. It should also be noted that "[A] waiver of the right to appeal includes a waiver of the right to appeal difficult or debatable legal issues-indeed, it includes a waiver of the right to appeal blatant error." United States v. Howle, 166 F.3d 1166, 1169 (11th Cir. 1999). Moreover, "a vigorous dispute about an issue during the

sentencing proceedings does not preserve that issue for appeal when the terms of the appeal waiver do not except it from the waiver." United States v. Bascomb, 451 F.3d 1292, 1296 (11th Cir. 2006).

Although there was a limited appeal waiver in this case, the Eleventh Circuit has clarified that counsel must still file a notice of appeal if directed to do so by his client, unless the movant has waived all of his appellate rights. See, Gomez-Diaz v. United States, 433 F.3d 788 (11 Cir 2005). Specifically, the Eleventh Circuit held that the general rule that an attorney who disregards instructions from his client to appeal acts in a manner that is per se professionally unreasonable applies with equal force where a defendant has waived some, but not all, of his appeal rights. Id. at 794.

Former counsel, Don Cohn, Esquire, a seasoned criminal defense attorney for over thirty years, testified that he was privately retained by the movant, as he was close, personal friends of the movant's parents and his sister. Attorney Cohn recalled that when he was retained by the movant, the movant was not yet formally charged by the government, but was the target of an investigation resulting from evidence seized as a result of the execution of a search warrant at Pantheon. Counsel testified unequivocally that early on in his representation, the movant advised him to resolve the case as he did not want to go to trial. Counsel also explained that the movant understood all of the terms of the negotiated plea agreement, but was not happy about going to prison for 78 months.

Counsel testified that after sentence was imposed, he spoke with the movant who indicated that he wanted to file an appeal. At that time, Attorney Cohn advised the movant to come by his office so that they could further discuss the appeal waiver, and what

issues, if any, he would want raised on appeal. Thereafter, Attorney Cohn recalled meeting with the movant and discussing in detail not only the appellate waiver, but that there were no nonfrivolous grounds for an appeal as the movant had gotten the benefit of the bargain from the plea agreement. According to Attorney Cohn, neither at the conclusion of that meeting, nor at any time thereafter, did the movant advise that he still wanted to pursue an appeal, and in fact, Attorney Cohn indicated that he got the sense from the movant that he did not want an appeal filed. Counsel testified that if the movant had indicated at any time during that meeting that, despite his advice, he still desired to prosecute an appeal, then counsel would have filed the notice on behalf of the movant.

Attorney Kaufman, another seasoned criminal defense attorney, testified that he was court appointed to represent the movant at a hearing regarding a request by probation to amend the movant's restitution amount on the basis that losses of two victims had been overlooked in the court's initial restitution order. Counsel recalled meeting with the movant to discuss the timeliness of the probation's attempt to modify the restitution order. Prior to the restitution hearing, counsel advised the movant that if the court amended the restitution amount as requested by the probation officer, there was no point in appealing the decision as the movant could not afford to pay the restitution in any event, and had also waived the right to appeal the restitution amount as part of the plea agreement. After the court ruled in favor of the probation officer's request and entered an amended order of restitution, counsel testified that he discussed with the movant his appellate rights. Attorney Kaufman was unequivocal when he testified that at the conclusion of that discussion with the movant, the never directed him to appeal the amended restitution order. Counsel

further denied ever receiving a call or correspondence from the movant directing that an appeal be filed.

The movant likewise did not contradict Attorney Cohn's testimony that he never directed counsel to file an appeal at the time he met with counsel to discuss pursuit of an appeal. In fact, the movant conceded under oath that he never said anything to counsel, and did not instruct Attorney Cohn to prosecute the appeal. The movant further acknowledged that he knew how to get in contact with counsel, but never wrote nor otherwise attempted to inform counsel post-sentencing of his desire to pursue an appeal. Moreover, the movant never indicated that he instructed Attorney Kaufman to prosecute an appeal from the amended restitution order.

Having carefully attended to the testimony of the witnesses at the evidentiary hearing, the witnesses' demeanor, and the record as a whole, the undersigned credits the testimony of movant's attorney, Don Cohn, that after consultation with the movant regarding the pursuit of an appeal of the sentencing judgment, neither the movant nor any relative ever directed or expressed a desire either orally or in writing that an appeal be filed. Moreover, the court credits Attorney Cohn's testimony that during that meeting, counsel never got the impression from the movant that he was still desirous of pursuing an appeal. The court further credits Attorney Kaufman's testimony that after the restitution hearing was concluded and an amended order entered, the movant also never instructed him to pursue an appeal therefrom.

Even if no consultation was ever had after sentencing or imposition of an amended restitution order, the court finds that a reasonable person in the movant's position would not have wanted to prosecute an appeal therefrom. See Roe v. Flores-Ortega, supra.

21

Under the totality of the circumstances present here, the court finds no deficient performance or prejudice has been established arising from counsel's failure to pursue a direct appeal or an appeal from the amended restitution order. Therefore, the movant is entitled to no relief on this claim.

<u>Remaining Claims</u>

In **claim two**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to argue that the government breached the terms of an use immunity agreement. (Cv-DE#1:Memo:4). On the one hand, the movant appears to argue that the proffer agreement should have been enforced, and therefore, the movant should not have been charged with violation of any federal law based on the immunity granted therein. Alternatively, the movant also argues that that he was under the effects of anti-depression medications which precluded him from understanding the terms and conditions of the informal grant of use immunity letter, as well as, the negotiated plea agreement, and the ensuing change of plea hearing. (Cv-DE#1:5-7).

In this case, determination of the extent of immunity afforded by the proffer agreement requires the application of basic principals of contracts law. <u>See</u> <u>United States v. Pielago</u>, 135 F.3d 703, 709 (11th Cir. 1998); <u>United States v. Weaver</u>, 905 F.2d 1466, 1472 (11th Cir. 1990); <u>Rowe v. Griffin</u>, 676 F.2d 524, 528 (11th Cir. 1982)("contractual analysis applies equally well to promises of immunity from prosecution"); <u>United States v. Harvey</u>, 791 F.2d 294, 300 (4th Cir. 1986)("[p]rivate law interpretive principles may be wholly dispositive in an appropriate case"). <u>See also</u> <u>Santobello v. New York</u>, 404 U.S. 257, 262 (1972). A basic tenet of contract law is that a written agreement which is unambiguous on its face should

22

be interpreted and enforced accordingly. <u>United States v. Weaver</u>, 805 F.2d at 1472. For example, whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of law. <u>Id</u>. If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly. Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind. <u>Id</u>. Such an approach is conformable not only to the policies reflected in private contract law from which it is directly borrowed, but also to constitutional concerns of fundamental fairness in "bargaining" for guilty pleas, and to the wider concerns expressed in the exercise of supervisory jurisdiction over the administration of federal criminal justice. <u>See</u> <u>United States v. Harvey</u>, 791 F.2d at 300 (citations omitted). Also, reformation of a written agreement is warranted only when the evidence demonstrates that the parties' mutual mistake resulted in a written document which does not accurately reflect the terms of their agreement. <u>See</u> <u>Restatement (Second) of Contracts</u> §155 (1979). Consequently, reformation is generally, without more, not an available remedy where the evidence demonstrates mistake or change of mind of only one of the contracting parties. <u>See</u> <u>Id</u>. at §153.

In this case, however, there is no ambiguity in the proffer agreement. To the contrary, the only immunity granted to the movant was limited, direct-use immunity in a trial or prosecution against him or at sentencing. Review of the record reveals that the movant's prosecution was based on evidence obtained from the Pantheon investigation which culminated in the execution of a search warrant at that business, done prior to the entry of the movant's proffer agreement. The government asserts that any

incriminating statements made by movant merely corroborated evidence obtained through cooperating witnesses, defrauded consumers, undercover investigators, as well as, documents seized pursuant to a search warrant at Pantheon.

Moreover, to the extent the movant means to argue that he was suffering from a mental disease or defect which prevented him from understanding the nature of the proffer agreement and his ensuing debriefing, that claim also fails on the merits for the reasons expressed in relation to claim three *infra*. Under these circumstances, the movant can establish neither deficient performance nor prejudice pursuant to <u>Strickland</u> and is therefore entitled to no relief on this claim.

In **claim three**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to ensure that his client was mentally competent at the time he committed the charged offense, when he entered into the proffer agreement and ensuing negotiated plea, and when he attended both the Rule 11 and sentencing proceedings. (Cv-DE#1:Memo:4). According to the movant, he was not mentally competent during those relevant time periods because he was under the care of a psychiatrist and internist, who prescribed numerous medications to treat his depression. (<u>Id</u>.5-8). The movant appears to fault counsel for failing to bring this fact to the court's attention at the change of plea proceeding, thereby rendering his plea involuntary. (<u>Id</u>.:8). At the evidentiary hearing, testimony was taken from Attorney Cohn and the movant's psychiatrist, Dr. Shlomo Pascal.

Dr. Pascal testified that in February 2002, he first saw the movant who was suffering from depression arising from the death of his mother and the break-up with a friend. Initially, the movant

24

was diagnosed with major depression and general anxiety, and was prescribed anti-depressant medications.

According to Dr. Pascal, the movant was seen by him a total of five times[6] between February 2002 and October 2002, and admits, however, that there was a four year gap until October 23, 2006, during which he did not see or treat the movant.[7] At the October 2006 visit, Dr. Pascal recalled that, although the movant was depressed and anxious because of his legal situation, and was having difficulty coping, the movant was nevertheless coherent. Therefore, Dr. Pascal could not conclude that the movant was totally impaired. Despite Dr. Pascal's belief that the movant's dependent personality disorder made him more "gullible" than an individual without that disorder, he did not believe that the movant was incompetent, nor that the medications to treat his depression were having any adverse effects. In fact, Dr. Pascal testified that he had discussions with the movant regarding the nature of the criminal charges, the fact that he faced prison time, and concluded from those discussions that the movant knew right from wrong, had the ability to understand that lying was wrong, and had no impulse to commit more crimes.

Attorney Don Cohn testified that when he first met with the movant to discuss the federal Pantheon investigation, the movant appeared depressed because of his parents' death. However, Attorney

---

[6]Specifically on February 2, March 2, April 2, September 10, and October 11.

[7]Thus, it appears that, contrary to the movant's allegations, he was not being treated by Dr. Pascal from October 2002 through October 2006. More importantly, during the time the petitioner became a target of the Pantheon investigation in 2004, it does not appear from the record that he was being treated by Dr. Pascal for depression. Consequently, it does not appear that the movant has established by objective evidence that he was, in fact, receiving ongoing treatment for his depression from late 2002 until October 2006.

25

Cohn was unequivocal that the movant's conversations at all times was coherent and intelligent. Attorney Cohn recalled that from the outset of his representation, the movant was adamant that he did not want to go to trial, and wanted the case resolved expeditiously. During one meeting, he recalled spending numerous hours reviewing with the movant the government's evidence, which included voluminous documents seized from Pantheon. Attorney Cohn recalled that, in accordance with his client's wishes, the government prepared a proffer agreement which he reviewed with the movant in detail prior to his execution. Thereafter, a formal negotiated plea agreement was prepared which he also reviewed with the movant in detail. Counsel candidly indicated that the movant did not like the terms of the plea which revealed that he could face 78 months in prison, but the movant nevertheless did not want to go to trial. Attorney Cohn explained that when the movant signed the plea agreement, the movant was fully aware of each of the terms and conditions contained therein, including the fact that he was going to prison.

Likewise, review of the change of plea hearing transcript reveals that Attorney Cohn's conclusion that the movant was aware of the terms and conditions of the plea was not error. At the outset of the change of plea hearing, the movant swore to tell the truth, and acknowledged under oath[8] that if he answered any questions "falsely," it could be used against him in another prosecution for perjury or making a false statement. (Cv-DE#1:Ex.10:4). The movant thereafter denied being treated in the last year for any mental illness or addiction to narcotic drugs.

_____

[8]Statements at the time of a plea colloquy are given a strong presumption of truth. Blackledge v. Allison, 431 U.S. 63 (1977). The subsequent presentation of conclusory allegations, unsupported by specifics, is subject to summary dismissal, as are contentions which in the face of the record are wholly incredible. Machibroda v. United States, 368 U.S. 487 (1962).

(Id.:4-5). The movant also denied having a physical or mental condition or illness which would prevent him from understanding the nature of the proceedings. (Id.:5). To the contrary, the movant acknowledged that he understood everything that was being asked of him. (Id.:5). The court then colloquied the movant at length regarding the terms of the negotiated plea agreement, as well as, the constitutional rights the movant was waiving by its entry. (Id.:5-10). Moreover, as previously narrated in this Report, it is evident from a review of the change of plea and sentencing transcripts that the movant was aware of the nature of the proceedings, and was not suffering from any mental disease or defect which would inhibit his ability to understand or participate in those proceedings.

Although there was evidence adduced at the evidentiary hearing that the movant may have suffered from depression, there is no record support for the proposition that this condition rendered the movant unable to participate in the underlying criminal proceedings, nor that it contributed to or caused him to violate federal law. To the contrary, it is evident that the movant was rational and competent at all relevant times. The law is clear that a court is required sua sponte to hold a competency hearing whenever there is substantial doubt concerning the defendant's competence. Pate v. Robinson, 383 U.S. 375 (1966). The factors giving rise to a trial court's obligation to hold a competency hearing are:  1) prior evidence of the defendant's irrational behavior; 2) the defendant's demeanor at trial; and 3) prior medical opinions regarding the defendant's competence to stand trial. Dusky v. United States, 362 U.S. 402 (1960); Sheley v. Singletary, 955 F.2d 1434, 1438 (11 Cir. 1992); Reese v. Wainwright, 600 F.2d 1085, 1091 (5 Cir.), cert. denied, 444 U.S. 983 (1979).

There are no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed, but at a minimum the defendant must have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and must have a rational, as well as, a factual understanding of the proceedings against him. Johnston v. Singletary, 162 F.3d 630, 634 (11th Cir. 1998), quoting, Dusky v. United States, 362 U.S. 402 (1960).  The presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to knowingly and voluntarily enter a plea as well as aid and assist in his own defense. Wolf v. United States, 430 F.2d 443, 444 (10 Cir. 1970). The mental illness or disability must have been so debilitating that the defendant was unable to consult with his attorney and did not have a rational and factual understanding of the proceedings. Bolius v. Wainwright, 597 F.2d 986, 990 (5th Cir. 1979). No such showing has been made in this collateral proceeding.

As discussed previously, at the change of plea hearing, the movant under oath denied that he suffered from any mental or physical illness that would prevent him from understanding the nature of the proceedings. Although Dr. Pascal testified at the evidentiary hearing that the movant suffered from depression, he has never indicated that the movant was not competent nor that the medications the movant was prescribed would inhibit his ability to function or think rationally.

Even if counsel had requested a competency or mental evaluation prior to the change of plea proceeding, no showing has been made in this collateral proceeding that the results of such an examination would have established that the movant suffered from some mental disease or defect or diminished capacity at the time of

the offense, or any time thereafter which would have prevented him from assisting counsel, participating in his own defense, or from entering into a negotiated plea. This Court therefore finds that the movant's plea was knowing and voluntary, and his allocution at sentencing coherent and rational. The movant's attempts in this collateral proceeding to show that he did not make an informed and voluntary choice because he was suffering from a mental disease or defect, or alternatively, because he was heavily medicated, is rejected as incredible and unsupported by the record. Under the totality of the circumstances present here, the movant has also failed to establish either deficient performance or prejudice pursuant to <u>Strickland</u> arising from counsel's failure to pursue this claim. He is thus entitled to no relief on this claim.

In **claim four**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to object to the court's determination that home confinement in lieu of prison was not available as a sentencing option. (Cv-DE#1:Memo:4).

As previously narrated in this Report, the court conducted a thorough Rule 11 proceeding wherein the movant was specifically colloquied regarding his appellate waiver. Consequently, he is precluded from challenging in this collateral proceeding his sentence even in the guise of an ineffective assistance of counsel claim. It is well-settled that sentence appeal waivers are valid if made knowingly and voluntarily. <u>Williams v. United States</u>, 396 F.3d 1340, 1341 (internal citation omitted). The Eleventh Circuit has held that "[A] valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel during sentencing." <u>Williams v. United States</u>, 396 F.3d

1340, 1341 (11th Cir. 2005); see also, Leach v. United States, 171 Fed.Appx. 765 (11th Cir. 2006); Johnson v. United States, 2007 WL 4615236 *5-6 (S.D. Fla. 2007). As noted by the Williams court, to hold otherwise would permit the movant "to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to his sentence as a claim of ineffective assistance, thus rendering the waiver meaningless." Williams v. United States, supra.

Briefly, however, it should be noted that even if counsel had argued to the court that it could impose a term of home confinement in lieu of prison, no showing has been made here that the court would have been amenable to fashioning such a sentence. To the contrary, as previously narrated, the court found the movant's role in defrauding hundreds of victims to be quite serious. (Cv-DE#1:Ex.G). In fact, the court specifically advised the movant that "probation is not an option" and that "home confinement is not an option." (Id.:7). Prior to imposing sentence, the court also indicated that it had considered the statements of the parties, the PSI containing the advisory guidelines, as well as, the statutory factors, and determined that the low end of the advisory guideline range was a reasonable sentence. (Id.:11). Under these circumstances, no prejudice has been established under Strickland arising from counsel's failure to further pursue this issue. He is therefore entitled to no relief on this claim.

In **claim five**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to request a downward departure from the guideline range, pursuant to U.S.S.G. §5K2.13, based on the movant's diminished mental capacity. (Cv-DE#1:Memo:10).

U.S. Sentencing Guidelines §5K2.13 states:

**§5K2.13-<u>Diminished Capacity</u> (Policy Statement)**

A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Pursuant to Application Note 1 of U.S.S.G. §5K2.13, "significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful. <u>See</u> U.S.S.G. §5K2.13, App.n.1.

To be entitled to a downward sentencing departure based on diminished capacity, a defendant must demonstrate that his or her significantly reduced mental capacity bears a causal relationship to the crime that consists of more than emotional weakness that leaves one open to suggestion; the defendant must show an inability to process information or to reason. <u>United States v. Withers</u>, 100 F.3d 1142 (4 Cir. 1996). In other words, the diminished mental capacity must have contributed to the offense of conviction. <u>United States v. Miller</u>, 146 F.3d 1281, 1286 (11th Cir. 1998), <u>citing</u>, <u>United States v. Holden</u>, 61 F.3d 858 (11th Cir. 1995). In this case, the movant has failed to establish that he suffered from a significantly reduced mental defect or disease. To the contrary, although there was evidence adduced in the underlying criminal

31

case, as well as, in this collateral proceeding, that the movant suffered from depression, no showing has been made that his depression contributed to the offense of conviction. Likewise, it is also evident that, although at times he was taking anti-depression medications, including, Zoloft, Triazederm, Cymbalta, Zanax, and Buspar, no adverse effects therefrom has been demonstrated.

Despite the fact that the record supports the movant's assertion that he suffered, and possibly continues to suffer, from depression, the movant has failed to demonstrate in this collateral proceeding that he was prevented by any alleged lack of mental capacity from understanding the lawfulness of his actions, and from comprehending the nature and extent of the proffer agreement he entered into with the government. In other words, the movant's mental condition, which at times may have required treatment with psychotropic medications,[9] does not establish that he was mentally incapacitated during the relevant time periods. The fact that the movant may have at times needed psychotropic medications weighs more in favor of his being able to function than not. See Brown v. McKee, 232 F.Supp. 761, 768 (E.D.Mich. 2002). Further, most mental illnesses are treatable, and with proper treatment many, if not most, sufferers are capable of managing their affairs. See Miller v. Runyon, 77 F.3d at 191-92.

As will be recalled, at the evidentiary hearing, Dr. Pascal

---

[9]Psychotropic drugs are a large class of drugs which affect mental activity. These drugs are used to treat serious psychotic disorders. They reduce the symptoms of hallucinations, delusions, paranoid ideation, and disturbed mental thought in patients. "The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." Washington v. Harper, 494 U.S. 210, 229 (1990). Many medical authorities consider these drugs to be the primary treatment for acute and chronic mental disorders. See Mills v. Rogers, 457 U.S. 291, 293 n. 1 (1982).

testified that the movant understood right from wrong, understood that he was being charged with violating federal law, and was going to prison. Although the movant was distraught, and at times depressed, Dr. Pascal never advised movant's counsel that the movant was incompetent nor that the medications the movant was taking inhibited his ability to function or think rationally.

There is nothing of record to suggest that the movant was unaware that his actions were unlawful nor that he lacked the power of reason or the ability to control behavior that he knows was wrongful. Moreover, the court had the benefit of the PSI, which provided information regarding the movant's mental and emotional health. Consequently, there has been no showing made in this collateral proceeding that further argument in this regard would have resulted in a downward departure based on diminished mental capacity or that the court would have benefitted from expert testimony regarding the movant's mental condition. Under these circumstances, the movant has failed to establish either deficient performance or prejudice pursuant to Strickland arising from counsel's failure to pursue this claim.

In **claim six**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to file a pretrial motion to suppress prior to the movant's change of plea proceedings. (Cv-DE#1:Memo:11).

The movant waived his right to contest all nonjurisdictional defects and defenses, when he entered a knowing and voluntary guilty plea. Where a criminal defendant enters a knowing, voluntary, and intelligent plea of guilty to an offense or offenses, he waives, or more accurately, forfeits all non-jurisdictional defects and defenses. See Smith v. United

States, 447 F.2d 487, 488 (5th Cir. 1971), citing, Hayes v. Smith, 447 F.2d 488 (5th Cir. 1971); see also, Wilson v. United States, 962 F.2d 966 (11th Cir. 1992); United States v. Broce, 488 U.S. 563 (1989); United States v. Glinsey, 209 F.3d 386, 392 (5th Cir. 2000), citing, United States v. Smallwood, 920 f.2d 1231, 1240 (5th Cir. 1991). "This includes claims of ineffective assistance of counsel except insofar as the ineffectiveness is alleged to have rendered the guilty plea involuntary." Id.  To enter into a voluntary plea, the defendant must understand the law in relation to the facts. McCarthy v. United States, 394 U.S. 459 (1969). In this case, the movant understood the facts and the elements of the offense upon which the charge rested. Moreover, by way of entering into the negotiated plea agreement, the movant was telling his lawyer not to conduct any further investigation and not present at a trial proceeding any legal defenses that he may be entitled to as it relates to his case. Likewise, this court credits counsel's testimony that the movant at all times wanted to resolve the charges and not proceed to trial. Under the circumstances present here, the petitioner cannot establish prejudice pursuant to Strickland arising from counsel's failure to file unidentified motions, or to seek suppression of evidence prior to the change of plea.

        In **claim seven,** the movant asserts that he was unaware of the consequences of his plea because he was suffering from a mental condition which resulted in his guilty plea being unintelligent, unknowing, and involuntary. According to the movant, despite his answers under oath at the change of plea hearing to the contrary, the movant now suggests that his plea was involuntary because, at the time of its entry, he was suffering from a mental defect which

34

precluded him from knowing the consequences of his action.[10] This claim is a mere reiteration of the arguments raised in connection with claim three above and should be denied for the reasons expressed therein.

### Conclusion

It is therefore recommended that this motion to vacate sentence be denied.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Signed this 8th day of July, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

---

[10]Even if, as the movant alternatively suggests, counsel was deficient for failing to advise him prior to the change of plea hearing that he faced prison time, the movant still cannot prevail on this claim because it was cured by the court's thorough Rule 11 proceeding. The law is clear that an inaccurate prediction about sentencing alone will generally not be sufficient to sustain a claim of ineffective assistance of counsel. United States v. Pease, 240 F.3d 938, 940-41 (11th Cir. 2001)(rejecting argument by defendant sentenced as a career offender that his plea was not knowing and voluntary because he had relied on counsel's prediction that his potential sentence under the plea agreement would be anywhere from five to ten years); United States v. Arvanitis, 902 F.2d 489, 494-95 (7th Cir. 1990)(no ineffective assistance where claim based only on inaccurate prediction of sentence). Thus, any alleged misadvice by counsel regarding the movant's sentence exposure was cured by the court's thorough change of plea proceeding. The movant is therefore entitled to no relief on this claim.

cc:  Martin Feigenbaum, Esquire
     P.O. Box 545960
     Surfside, FL 33154

     Jill P. Furman, Ass't Director
     Office of Consumer Litigation
     United States Dept. of Justice
     1331 Pennsylvania Avenue, N.W., #950 North
     Washington, D.C. 20004